**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | | |
|---|---|---|
| ISAAC JMAAL GATEWOOD, ADC #166860, | * * * | |
| Plaintiff, | * | |
| v. | * * | No. 4:17cv00341-JJV |
| STONE, Officer, FCSO; *et al.*, | * * | |
| Defendants. | * | |

**MEMORANDUM AND ORDER**

**I.      INTRODUCTION**

Isaac Jmaal Gatewood ("Plaintiff") brought this action *pro se* and under 42 U.S.C. § 1983. (Doc. No. 2.)   He alleged Defendant Stone[1] subjected him to excessive force during his confinement in the Faulkner County Detention Center.[2] (*Id*. at 5.)  This case came before the Court at a bench trial on April 30, 2018.  Following the presentation of testimony and the submission of other evidence, the Court determined Plaintiff had not met his burden of proving a violation of his Eighth Amendment rights by a preponderance of the evidence.  Accordingly, judgment will be entered in favor of Defendant Stone, and Plaintiff's Complaint is DISMISSED.

**II.     PLAINTIFF'S ALLEGATIONS**

According to Plaintiff's Complaint, the excessive force incident occurred during chow time on April 19, 2017.  (Doc. No. 2 at 5.)  Testimony and evidence presented at trial indicated it

---

[1] Defendant Stone's full name is David Stone.  The Clerk is directed to amend the docket to reflect his full name.

[2] Plaintiff also alleged he had been subjected to unconstitutional conditions of confinement. (Doc. No. 2 at 6.)  This claim was dismissed without prejudice because it was factually unrelated to the excessive force claim.  (Doc. Nos. 5, 7.)  Plaintiff's claims against Defendants Spikes, Page, Tim Ryles, Randall, Lasker, and Andrews were dismissed without prejudice for failure to state a claim.  (Doc. Nos. 5, 7.)

actually occurred on April 20, 2017. In any event, a trustee was handing out trays through the opening in the cell door where food is delivered – known as the "bean hole" – when, according to Plaintiff, the trustee accidentally spilled tea on Defendant Stone. (*Id.*) Defendant Stone became "irate" and snatched Plaintiff's arm through the bean hole, causing injury. (*Id.*) He then grabbed Plaintiff's cup and threw it down the hall. (*Id.*) Defendant Stone then entered the cell and "attacked" Plaintiff with "extreme physical force." (*Id.*) Plaintiff alleges Corporal Spikes, the officer on duty, gave Defendant Stone an order to "stop his attack," but Defendant Stone continued, attempting to grab Corporal Spikes's taser. (*Id.*) Plaintiff alleges he was eventually taken downstairs where his injuries were photographed. (*Id.*)

## III.   TESTIMONY AND EVIDENCE

Plaintiff testified on his own behalf and called three witnesses in support of his case. Sammie Leon Brown, David Conley, and Roy Brandon Ellis all testified they were Plaintiff's cellmates at the Faulkner County Detention Center and witnessed the excessive force incident. All three also testified they are now incarcerated in the Arkansas Department of Correction ("ADC"), but not at Plaintiff's unit, and have not had contact with Plaintiff since their time at the Faulkner County Detention Center.

Defendant Stone's case consisted of his own testimony and that of Corporal Spikes. Defendant Stone also admitted two exhibits.

### A.   Sammie Leon Brown

Sammie Leon Brown testified the trustee spilled tea on Defendant Stone's foot during chow, and Defendant Stone thought it was Plaintiff who had spilled the tea. He stated Defendant Stone grabbed Plaintiff's arm and then snatched and threw his cup. He then unlocked the cell door and "roughed [Plaintiff] up." According to Mr. Brown, Defendant Stone reached for Corporal

2

Spikes's taser, and Corporal Spikes gave him orders to stop. Corporal Spikes ultimately had to separate the two, putting Defendant Stone in the hallway. Mr. Brown said he could see that Plaintiff's shoulder was dislocated or hurt in some way, and Plaintiff went to sick call. On cross-examination, Mr. Brown acknowledged he is incarcerated on felony convictions and has sued Faulkner County several times. Mr. Brown testified he assisted Corporal Spikes in separating Plaintiff and Defendant Stone; Mr. Brown grabbed Plaintiff, and Corporal Spikes grabbed Defendant Stone. Mr. Brown stated Plaintiff's shoulder was "limp" and he tried to help Plaintiff put it back into place. He stated he did not observe any cuts or scrapes. Mr. Brown's written statement was admitted into evidence as Defendant's Exhibit 1. That statement is mostly consistent with Mr. Brown's trial testimony; it also says Defendant Stone's conduct nearly incited a riot and he put the handcuffs on Plaintiff "super tight."

    **B.**   **David Conley**

David Conley testified Defendant Stone accused Plaintiff of throwing the tea on him, which Plaintiff did not do. He said Defendant Stone threw Plaintiff's cup, twisted his arm, and entered the cell, where he handcuffed Plaintiff and removed him from the pod. According to Mr. Conley, Plaintiff's wrist was red, but he did not observe any blood or broken bones. On cross-examination, Mr. Conley acknowledged he is currently incarcerated on a felony conviction and has received two major disciplinaries in his current term of incarceration for failing to obey orders. He also acknowledged he has sued Faulkner County. He stated this incident occurred in Unit 1, where felons are housed, and there were approximately twelve people in the cell at the time. According to Mr. Conley, he was behind Plaintiff and to the side, the next person in line for a tray, and he could see through the bean hole. After the trustee spilled the tea and Plaintiff asked for more, there was "arguing." Mr. Conley acknowledged he could not actually see the altercation through the

3

bean hole and did not see the twisting of Plaintiff's arm, although he heard Plaintiff say something about it.  He said Defendant Stone shut the bean hole door and opened the cell door, accompanied by Corporal Spikes.  Defendant Stone tried to handcuff Plaintiff while Corporal Spikes watched.  Mr. Conley could see Plaintiff's wrists were red from the handcuffs; he did not remember a shoulder injury.  In answer to questions posed by the Court, Mr. Conley said he did not remember the interaction between Defendant Stone and Corporal Spikes.

### C. Roy Brandon Ellis

Roy Brandon Ellis testified he was two people behind Plaintiff in line for a tray.  He said Defendant Stone became angry at the spilled tea, which was clearly an accident, and snatched Plaintiff's arm through the bean hole.  He said Defendant Stone then came into the cell, and Plaintiff backed away from the door.  Defendant Stone put Plaintiff against the wall and tried to "crush" his wrists with the handcuffs.  Corporal Spikes eventually stepped in as Plaintiff's cellmates were telling Defendant Stone to stop and saying Corporal Spikes should be the one to handcuff Plaintiff.  On cross-examination, Mr. Ellis stated he had only been Plaintiff's cellmate for seven or eight days prior to this incident and there was tension between the two of them because Mr. Ellis had previously been blamed and disciplined for something Plaintiff had done.  On this occasion, there were approximately fifteen people in the cell.  Mr. Ellis stated Defendant Stone grabbed Plaintiff's hand through the bean hole, ripping the skin off Plaintiff's hand and leaving blood, and then threw the cup down the hallway.  Mr. Ellis stated he did not know whether Plaintiff suffered other injuries because Plaintiff was removed from the cell.  He testified Corporal Spikes was not present until after the bean hole incident.  As he and Defendant Stone opened the cell door, Plaintiff backed away from the door, saying the spilled tea was an accident.  Defendant Stone was being aggressive; Corporal Spikes stood off to the side.  Mr. Ellis testified Plaintiff resisted the

4

handcuffs but asked if Corporal Spikes could be the one to handcuff him. He eventually submitted to Defendant Stone, and Corporal Spikes came in as Defendant Stone was finishing applying the handcuffs.

### D. Isaac Jmaal Gatewood

Plaintiff testified on his own behalf. He stated he was first in line to receive a tray and gave his cup to the trustee, who filled it up and started to give it back, but it fell before Plaintiff could take it. Defendant Stone became angry. Plaintiff asked for more tea and reached out of the bean hole. Defendant Stone pulled his arm through the hole, cutting the top of his hand and arm and hurting his shoulder. Defendant Stone then closed the door to the bean hole and unlocked the cell door. He waited on Corporal Spikes to arrive before entering. Plaintiff walked backward toward the wall; Defendant Stone was telling Plaintiff he would be going to lock-up, and Plaintiff was trying to explain the spill was an accident. Defendant Stone got one handcuff on Plaintiff before Corporal Spikes took over. Plaintiff was taken to the first floor, where he was handcuffed to a bench. He gave a statement and his injuries were photographed. According to Plaintiff, the cut on top of his hand was "not too bad." He also had a cut on the inside of his arm, and his shoulder hurt, though it was not dislocated. He did not see the nurse until two days later. He did not receive a disciplinary. Plaintiff acknowledged, in response to the Court's questions, that he has been disciplined for an altercation with another inmate since arriving at ADC.

On cross-examination, Plaintiff testified he had already received his tray and came back to the bean hole with his cup. He said he was on his knees looking through the hole and put his arm out about six to twelve inches. The trustee handed the cup of tea back to Plaintiff and Plaintiff told him to put more in it. The trustee turned to put more tea in the cup and then placed the cup on the ledge of the bean hole. It fell over when Plaintiff reached for it. Plaintiff said Defendant

Stone was to the left of the trustee when the cup fell. Plaintiff acknowledged he and other inmates laughed when Defendant Stone became angry. He said other inmates had been "messing with" Defendant Stone about something that happened in another county. Plaintiff stated he asked the trustee to retrieve his cup and fill it up again after the spill. Defendant Stone threw the cup and said, "Come on." Plaintiff started backing away from the door. Plaintiff said he backed all the way up as Defendant Stone approached him. Defendant Stone got one handcuff on, and Plaintiff did not want him to get the other one on. He acknowledged he physically resisted and did not turn around and offer his hands to be handcuffed. Corporal Spikes ultimately got the second handcuff on. Plaintiff acknowledged he refused medical attention at the time and had a bleeding scrape on his arm but no visible injury to his shoulder.

### E.   David Stone

Defendant Stone testified he had been in law enforcement for approximately five years and had never been disciplined or sued for using excessive force. He stated the tea did not spill; Plaintiff threw it, and Defendant Stone was covered in tea from his belly button down. Plaintiff had his arm through the bean hole, up to his elbow, and demanded more tea. When Defendant Stone refused, Plaintiff started swearing at him. Defendant Stone took the cup from Plaintiff's hand but did not use force, then shut the bean hole door and called for Corporal Spikes. Defendant Stone denied using excessive force inside the cell as well. He said Corporal Spikes had to draw his taser at one point as other detainees crowded around them. According to Defendant Stone, Plaintiff had only a small scrape on his upper arm, which was not bleeding.

Defendant Stone's incident report was entered into evidence as Defendant's Exhibit 2. The report is consistent with Defendant Stone's trial testimony: Plaintiff threw the cup of tea on him, and Defendant Stone took the cup and threw it on the ground, then shut the bean hole door and

called for an available officer to assist him in removing Plaintiff from the cell to be taken to booking for disciplinary action. When Corporal Spikes arrived and they opened the cell, Defendant Stone gave Plaintiff several orders to step out. When he attempted to escort Plaintiff out, Plaintiff "jerked away." Defendant Stone ordered him to place his hands behind his back and he refused. Defendant Stone and Corporal Spikes together attempted to get the handcuffs on while Plaintiff resisted. Plaintiff continued to resist as he was being removed from the cell, so Defendant Stone "twisted the cuffs and slightly raised them up to regain control." Corporal Spikes then escorted Plaintiff to booking while Defendant Stone finished passing out trays.

### F.  Shamar Spikes

Corporal Shamar Spikes testified he was Defendant Stone's supervisor on this particular shift. He stated he was not present when the tea was spilled; by the time he arrived at the cell, the bean hole door was closed. When he and Defendant Stone entered the cell and told Plaintiff to turn around to be handcuffed, Plaintiff refused, saying he did not want Defendant Stone to touch him. Corporal Spikes observed Plaintiff backing away from Defendant Stone and testified he was refusing to be handcuffed. Corporal Spikes did not see any injuries. Specifically, he said he did not see any marks left by the handcuffs and did not need to adjust them as he escorted Plaintiff downstairs. In response to the Court's questions regarding why Plaintiff was not charged with a disciplinary, Corporal Spikes said if it had been up to him, he would have issued one. He stated it was the responsibility of Defendant Stone, as the officer involved, to choose whether to issue a disciplinary.

## IV.     ANALYSIS

### A.     Official Capacity Claim

Plaintiff sued Defendant Stone in both his personal and official capacities.  (Doc. No. 2 at 3.)  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690, n. 55 (1978)).  As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity.  *Id*. at 166.  Thus, Plaintiff's official capacity claim against Defendant Stone is to be treated as a claim against Faulkner County.  Section 1983 liability against municipalities and other local government units is limited:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.  Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell*, 436 U.S. at 690-91.  A municipality cannot be held liable under § 1983 on a *respondeat superior* theory.  *Id*. at 691.  *See also Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535-36 (8th Cir. 1999).

Plaintiff has not identified any official policy or unofficial custom of Faulkner County that caused or contributed to his alleged injuries.  Because Plaintiff makes no allegation that Defendant Stone was implementing an unconstitutional policy or custom, his official capacity claim must be dismissed.

B.   **Personal Capacity Claim**

When addressing an excessive force claim brought under § 1983, a court's analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Id*. According to Plaintiff's Complaint, he was still awaiting trial on pending criminal charges at the time of the use of force incident. (Doc. No. 2 at 4.)  However, as the Court stated at the outset of the bench trial, Plaintiff was sentenced on April 17, 2017, three days prior to the use of force incident.  Because of Plaintiff's status as a prisoner, his excessive force claim is to be evaluated under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

In an Eighth Amendment excessive force claim, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  Under this approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation, "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id*. (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  In determining whether a use of force was wanton and unnecessary, it is also proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the

9

threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id*. Thus, the extent of the resulting injury, "while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement" for proving an Eighth Amendment excessive force claim. *Williams v. Jackson*, 600 F.3d 1007, 1012 (2010) (citing *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam)).

It was Plaintiff's burden to prove his case by a preponderance of the evidence. *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). In view of all the evidence, the Court finds he did not meet his burden of showing Defendant Stone used force maliciously and sadistically to cause harm.

1. The Bean Hole Incident

It is unclear whether Plaintiff intentionally threw the tea on Defendant Stone or whether he or the trustee accidentally spilled it as it was being transferred between them. What is clear is that Plaintiff's arm was reaching out through the bean hole when Defendant Stone took the cup from him. Plaintiff's hand and arm were evidently scraped at this point. But even if Defendant Stone snatched the cup from Plaintiff or grabbed it with some strength, this would not have amounted to anything more than a *de minimis* use of force. "[B]ecause 'not . . . every malevolent touch by a prison guard gives rise to a federal cause of action,' a *de minimis* application of force will not give result in a constitutional violation." *Williams*, 600 F.3d at 1012 (quoting *Hudson*, 503 U.S. at 9). The Court does not credit Mr. Conley's testimony that Defendant Stone twisted Plaintiff's arm, as Mr. Conley acknowledged he could not actually see the altercation through the bean hole and only believed Plaintiff's arm had been twisted based on what Plaintiff said. Plaintiff's other witnesses would have likewise been unable to see the altercation through the bean hole, and their testimony

10

that Defendant Stone pulled Plaintiff's arm through the hole is not particularly convincing, given Plaintiff's testimony that his arm was already reaching through the hole as he asked for more tea.

Also instructive is the undisputed fact that any injuries Plaintiff sustained were minimal. He admitted the cut on his hand was "not too bad" and he refused medical attention at the time, only asking to see the nurse two days later when advised by other inmates he needed medical evidence to support a lawsuit. While Mr. Brown suggested Plaintiff's shoulder had been dislocated, the Court does not find this testimony credible; Plaintiff himself acknowledged he had no visible shoulder injury. Although a significant injury is not a threshold requirement for stating an excessive force claim, the absence of a significant injury is relevant. *Wilkins*, 559 U.S. at 37. This is because the Eighth Amendment's prohibition of cruel and unusual punishments "necessarily excludes from constitutional recognition *de minimis* uses of physical force," and the extent of injury may provide "some indication of the amount of force applied." *Id*. at 37-38. Here, minor scrapes on Plaintiff's hand and arm indicate Defendant Stone used only *de minimis* force, if any at all. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id*. at 38 (quoting *Hudson*, 503 U.S. at 9).

For these reasons, Plaintiff has failed to meet his burden of proving, by a preponderance of the evidence, Defendant Stone used force maliciously and sadistically with the purpose of causing harm by pulling on his arm through the bean hole.

2. The Cell Incident

With respect to Plaintiff's allegation that Defendant Stone used excessive force inside the cell, it is clear to the Court that any force used was the result of Plaintiff's refusal to obey orders and his physical resistance to being handcuffed. Plaintiff acknowledged in his testimony that he backed toward the wall as Defendant Stone approached, did not turn around to offer his hands to

11

be handcuffed, and physically resisted. Mr. Ellis similarly testified Plaintiff backed away from Defendant Stone and resisted the handcuffs. This testimony is consistent with Defendant Stone's written report, wherein he stated he gave Plaintiff several orders to step out of the cell and tried to escort Plaintiff from the cell but Plaintiff "jerked away." Plaintiff then refused orders to place his hands behind his back and resisted as Defendant Stone and Corporal Spikes worked together to get the handcuffs on. And Corporal Spikes also testified that Plaintiff backed away, refused to turn around, and resisted the handcuffs. Throughout this encounter, the approximately twelve to fifteen other detainees in the cell crowded around.

Additionally, the only specific force Plaintiff's witnesses alleged Defendant Stone used at this point was placing the handcuffs on too tightly. The only injury they observed was that Plaintiff's wrists were red. The Court does not find their testimony credible in light of Corporal Spikes's testimony: he did not observe any marks left by the handcuffs and did not need to adjust the handcuffs as he escorted Plaintiff downstairs. The Court credits this testimony and finds the handcuffs were not applied too tightly. Also, according to Defendant Stone's written statement, he "twisted the cuffs and slightly raised them up to regain control" because Plaintiff continued to resist as he was being escorted out of the cell. If Defendant Stone used any force, it was both *de minimis* and necessitated by Plaintiff's physical resistance. There is no "specific evidence of a malicious motive to harm, or evidence that the force used was so greatly in excess of that needed to restore and maintain order as to raise a reasonable inference of malicious motive." *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014).

Accordingly, the Court finds Plaintiff has not met his burden of proving, by a preponderance of the evidence, that Defendant Stone acted maliciously or sadistically inside the

cell. Rather, the evidence supports a finding Defendant Stone acted in a good-faith effort to restore discipline.

## V.     CONCLUSION

After careful review of the testimony and evidence, the Court finds Plaintiff has failed to prove his claim against Defendant Stone by a preponderance of the evidence, and judgment should be entered in favor of Defendant Stone.

IT IS, THEREFORE, ORDERED that:

1. The Clerk amend the docket to reflect the full name of Defendant David Stone.

2. Plaintiff's Complaint (Doc. No. 2) is DISMISSED with prejudice. An appropriate Judgment shall accompany this Memorandum and Order.

DATED this 7th day of May, 2018.

JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE